THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:18-cv-00038-MR
CRIMINAL CASE NO. 2:09-cr-00015-MR-DLH

| | | |
|---|---|---|
| JOHN DOUGLAS BIRD, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Petitioner's Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 [CV Doc. 1]; the Petitioner's Motion for Leave to Conduct Discovery [CV Doc. 8]; and the Government's Motion to Dismiss [CV Doc. 13].

I.    **BACKGROUND**

A.    **The Shooting**

On the morning of Christmas Day, December 25, 2008, the victim, Meroney George "Garce" Shell ("Shell"), was walking in the woods at the end of Bunches Creek Road within the boundaries of the Eastern Band of Cherokee Indians reservation. [CR Doc. 69 at 76-79].  Shell was searching

for hornet nests to harvest and carve into masks to sell.  [Id. at 78].  He heard

someone behind him, and turned and saw the Petitioner John Douglas Bird,

Jr. standing near a gray truck and holding a rifle at his side.  [Id. at 79-80,

101].  Shell immediately recognized the Petitioner because they once had

been co-workers.  [Id. at 71-72, 80].  The Petitioner told Shell that he was

going to shoot him.  [Id. at 80-81].  Shell responded by cursing the Petitioner,

then telling him, "You might as well kill me.  You've got the gun."  [Id.].  The

Petitioner then began shooting Shell, hitting him multiple times in the face

and arm.[1]  [Id. at 81, 83-88; CR Doc. 70 at 215-17].

Shell had consumed an excessive amount of alcohol prior to this

incident.  Whether it was attributable to having been shot in the head or to

his alcohol consumption (or both), Shell experienced significant gaps in his

memory.  [CR Doc. 69 at 74-75].  Following the shooting, Shell next recalled

driving back down Bunches Creek Road and wiping blood off his face; he

could not recall how he got to his car or how long it had been since he had

---

[1] Shell suffered serious bodily injuries as a result of the shooting, including a fracture
below his left eye, a fracture on his right cheek that broke his upper jawbone, and several
gunshot wounds to his right arm.  Additionally, he had a bullet lodged in the back of his
neck.  [CR Doc. 70 at 214-16].  Shell was placed on a mechanical ventilator twice during
his hospital stay and had to receive nutrition through a tube down his nose due to the
fractured jaw. [Id. at 216-17].  He also had a blood clot in his carotid artery that needed
close attention for fear of a stroke.  [Id. at 217].  At the time of trial, he continued to suffer
from long-term damage to his right hand and arm.  [Id. at 218-19].

been shot.  [Id. at 81]. When Shell attempted to pull his car over alongside the creek, he wrecked and fell out of his car, tumbling down an embankment and falling into the icy water.  [Id. at 82].  He crawled back up the bank to the road where neighbors found him.  One of those neighbors, Theresa McCoy ("McCoy"), rendered him some assistance and called the police.  [Id. at 82-83, 121-22].  When McCoy asked Shell who had injured him, he was able to tell her, "John Bird."  [Id. at 83, 124, 127].  McCoy recalled having seen Shell's car earlier going up the road toward the woods at approximately 11:00 or 11:15 a.m., and she estimated that Shell's wreck occurred between 12 noon and 12:15 p.m.  [Id. at 119-22].

Shell was transported to Mission Hospital in Asheville, North Carolina. There, FBI Special Agent Craig Sidwell ("SA Sidwell") was able to speak briefly to Shell, although his injuries prevented a full interview at that time. Shell identified the shooter as "Little Johnny Bird."  [CR Doc. 69 at 107].  SA Sidwell passed that information on to Detective Gene Owl of the Cherokee Indian Police Department.  [Id. at 141].  Detective Owl then began to back-track Shell's whereabouts prior to the shooting.  At approximately 7:45 p.m. on Christmas Day, Detective Owl went to the home of Chuck Taylor because he had been told that Shell had visited Taylor on Christmas Eve.  [Id. at 141-42].  As Detective Owl walked up onto Taylor's porch, through the screen

door he saw the Petitioner standing in the living room. [Id. at 142]. When Detective Owl and the Petitioner made eye contact, the Petitioner fled out the back door and escaped into the woods. [Id. at 142-44]. The Petitioner was not arrested until January 8, 2009, when he was found hiding in the closet of his father's home. [CR Doc. 70 at 226-29].

## B. The Petitioner's Confession

Detective Owl interviewed the Petitioner at the Cherokee Indian Police Department on January 9, 2009. The detective advised the Petitioner of his <u>Miranda</u> rights, and the Petitioner indicated that he understood his rights and agreed to provide an interview. [CR Doc. 69 at 144]. As the interview began, however, the Petitioner vomited into a trash can. [Id. at 144-45]. When Detective Owl asked him what was wrong, the Petitioner said that his stomach was "messed up" and had been like that for "a couple years," and that he had to drink "a couple beers each morning to make his stomach feel better." [Id. at 145]. Although Detective Owl assumed that the Petitioner was experiencing symptoms of alcohol withdrawal, this assumption was never medically confirmed. [Id. at 176]. The Petitioner thereafter provided an approximately 45-minute-long interview without further incident, during which he denied any knowledge of the shooting and provided an account of his whereabouts on Christmas Eve and Christmas Day. [Id. at 145-55].

The following day, Detective Owl brought the Petitioner to the office of North Carolina State Bureau of Investigation ("SBI") Special Agent Chris Smith ("SA Smith") to conduct a second interview.[2] [CR Doc. 69 at 155-56]. When Detective Owl arrived at the Swain County Detention Center to transport the Petitioner to the SBI office, the Petitioner threw up again. [Id. at 157-58]. The Petitioner did not request medical attention or seek a delay of the interview. [Id. at 158]. Detective Owl recalled that the Petitioner vomited two additional times in the patrol car during the hour-long trip to Agent Smith's office. [Id. at 184]. Once they arrived at the SBI office, however, the Petitioner did not vomit at any time in the office or during the taking of his statement. [Id. at 185, 196]. Agent Smith again advised the Petitioner of his Miranda rights. The Petitioner indicated that he understood his rights and agreed to waive them, both orally and in writing. [Id. at 196-97]. As he was aware of the Petitioner's earlier stomach upset, Agent Smith asked the Petitioner if he felt okay and offered him some water. [Id. at 196-99]. Agent Smith concluded that there was no physical reason to reschedule, so he proceeded to interview the Petitioner. During the interview, the Petitioner confessed to shooting Shell. [Id. at 197]. Agent Smith thereafter

---

[2] This second interview was preceded by a polygraph examination, but this fact was not disclosed to the jury.

5

turned the Petitioner back over to Detective Owl for a follow-up interview. [Id. at 157, 197-98].

During this follow-up interview with Detective Owl, which lasted approximately ten to fifteen minutes, the Petitioner again confessed to shooting Shell and provided some details of the incident that he would not have otherwise known, although he claimed that he could not remember the entire event. [Id. at 159-60]. The Petitioner recalled that it occurred "somewhere in the mountains." [Id. at 159]. He also remembered that Shell cussed him, saying, "Shoot me, bitch," or something similar. [Id. at 160]. The Petitioner further stated, "I didn't want to kill him. I made a mistake. I ain't no killer." [Id. at 160-61].

### C.    The Criminal Proceedings

On April 7, 2009, the Petitioner was charged in a Bill of Indictment with attempted murder, in violation of 18 U.S.C. §§ 1113 and 1153 (Count One); assault with intent to commit murder, in violation of 18 U.S.C. §§ 113(a)(1) and 1153 (Count Two); assault with a dangerous weapon with intent to do bodily harm, in violation of 18 U.S.C. §§ 113(a)(3) and 1153 (Count Three); assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 113(a)(6) and 1153 (Count Four); and use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Five). [CR Doc.

3]. The Indictment alleged that all these offenses were committed by an Indian within the boundaries of the Eastern Band of Cherokee Indians reservation. [Id.].

On June 2, 2009, the Petitioner filed a motion to suppress his confession. [CR Doc. 14]. The District Court, with the Honorable Lacy H. Thornburg presiding,[3] conducted a hearing on the motion on June 8, 2009. At the suppression hearing, SA Smith testified that Detective Owl contacted him and asked him to conduct a polygraph examination of a suspect in a shooting and that SA Smith agreed to conduct the polygraph. [CR Doc. 31 at 5]. Describing how he conducts a polygraph, SA Smith testified that he begins by reading an examinee his Miranda rights, after which he talks with the examinee, learning a little about him and why he is there. [Id. at 5-6]. SA Smith testified that he also talks with the examinee about how and why the polygraph works. [Id. at 6]. SA Smith testified that once this "pretest" is complete, they take a break while SA Smith compiles the test questions. [Id.].

Addressing the Petitioner's polygraph, SA Smith testified that he understood that the Petitioner's stomach had been upset and that the

---

[3] Judge Thornburg retired shortly after the trial of this matter. Thereafter, this case was reassigned to the undersigned.

Petitioner had vomited in Detective Owl's car on the way to the SBI. [CR Doc. 31 at 10]. SA Smith explained that ensuring an examinee's physical competency is one of his first tasks and that after advising the Petitioner of his Miranda rights, he asked the Petitioner if he felt okay and offered him some crackers and water to settle his stomach. [Id.]. When the Petitioner affirmed that he was feeling better, SA Smith began the polygraph. [Id.]. SA Smith testified that the Petitioner did not vomit during the exam and "seemed to be fine" to answer questions. [Id.]. SA Smith testified further that he explains to all examinees that a polygraph is voluntary and that Bird "never asked to stop and never gave any indication that he wanted to stop." [Id. at 11].

At the conclusion of the hearing, the Court denied the motion and the case proceeded immediately to trial. This trial ended in a mistrial after a day of testimony when a Government witness referenced the fact that the Petitioner had been given a polygraph examination, after the Court had granted a motion *in limine* excluding all references to the polygraph.

The case was re-tried on August 3 and 4, 2009. During the trial, Shell testified that he first met the Petitioner when they worked together for the Petitioner's girlfriend's father. [CR Doc. 69 at 72]. Although Shell could not recall a fight or other dispute between him and the Petitioner, he testified that

there "evidently" had been some kind of issue because the Petitioner was "the guy that shot [him].'" [Id. at 73]. Shell acknowledged that he was drinking on Christmas Eve and that he did not "have a complete memory" of Christmas Eve or Christmas Day. [Id. at 75]. Shell testified that he drove his black Ford Mustang to the Bunches Creek area of the Cherokee reservation and that he believed it was Christmas morning when he went to look for hornet nests. [Id. at 78-79]. Shell also testified that when he turned and saw the Petitioner standing with his rifle between 20 and 25 feet away from Shell, he "immediately" recognized him. [Id. at 80]. Shell testified that he had "[n]o doubt at all" that the Petitioner was the person who shot him and that he had earlier seen an older model gray truck that the Petitioner might have driven to Bunches Creek. [Id. at 98, 101]. Shell testified further that after his accident, he recalled hearing McCoy ask him repeatedly who had "[done] it" and that he responded, "John Bird." [Id. at 83].

The Petitioner's counsel cross-examined Shell extensively, asking him at length about his drinking habits around the time of the shooting and soliciting his testimony that he sometimes drank between a twelve-pack and a case of beer in one day and drank an average of a six-pack a day. [CR Doc. 69 at 90-91]. Shell estimated that he and two or three friends drank four cases of beer between December 22 and Christmas Eve. [Id. at 92].

Shell acknowledged on cross-examination that he thought that he and the Petitioner had gotten along well.  [Id. at 89].

Shell's brother, Perry Shell, testified that he was present at the hospital when SA Sidwell asked Shell who had shot him.  [CR Doc. 69 at 107].  Perry testified that his brother was difficult to understand but that Perry heard Shell tell SA Sidwell that "Little Johnny Bird" had done it.  [Id. at 107].

Theresa McCoy testified that she saw a black Mustang drive by her home on Bunches Creek a few minutes after 11:00 a.m. on Christmas morning.  [CR Doc. 69 at 120].  McCoy testified that at approximately 12:15 p.m., she saw smoke in the direction of the road, as if a car were stuck with its wheels turning.  [Id. at 121].  A few minutes later, Britney Welch ("Britney"), one of the women renting McCoy's brother's house next door, contacted McCoy asking her to call 911 because the driver of the car was hurt.  [Id. at 122].  McCoy testified that she accompanied Britney to the crash site, where McCoy immediately recognized Shell.  [Id. at 123-24].  McCoy testified that she asked Shell whether he could hear her and that after Shell nodded his head, she asked Shell what happened.  [Id. at 124].  Shell responded that "[t]hey followed [him] in town" and that "John Bird" had "[done] this." [Id. at 124].  McCoy described wrapping Shell in blankets and encouraging him to stay awake.  [Id. at 124-25].  McCoy testified that Shell was able to talk and

to respond when she "first got there" but that after a few minutes, he began "shutting down."  [Id. at 132-33].

Detective Owl testified at trial that he asked SA Sidwell to interview Shell and that after he heard from SA Sidwell, he began looking for the Petitioner.  [CR Doc. 69 at 140-41].  Detective Owl testified that SA Sidwell had only given him "the name of the person that had shot Mr. Shell."  [Id. at 153].  Detective Owl testified that the Petitioner fled as soon as Owl made eye contact with him on Christmas night.  [Id. at 143, 169].  Detective Owl also testified that when he interviewed the Petitioner on the day after his arrest, the Petitioner stated that he had run from Owl on Christmas night because "he didn't know anything about what was going on."  [Id. at 146-47].  Detective Owl then asked the Petitioner about his relationship with Shell, and the Petitioner stated that he "heard about the wreck while he was at his grandmother's house."  [Id. at 147].  When Owl noted that he had not mentioned anything about a wreck, the Petitioner responded that he had heard that Shell had wrecked on Bunches Creek.  [Id.].  Detective Owl testified that the Petitioner stated that he spent Christmas Eve with his father and Nellie Littlejohn, his father's girlfriend, and that he was at Dahne Driver's house from 8:00 or 9:00 a.m. on Christmas morning until approximately 12:30 p.m., when his grandmother picked him up to chop wood at her house.

[Id. at 150-53]. The Petitioner stated that he stayed at his grandmother's house until 7:00 p.m. on Christmas night. [Id. at 153].

Detective Owl also testified about the Petitioner's later confession, explaining that after SA Smith was finished talking with the Petitioner, following the polygraph, Detective Owl asked the Petitioner whether the Petitioner had shot Shell and the Petitioner responded, "[y]es" and that he would "man up" and admit that he made a mistake. [CR Doc. 69 at 159].

Detective Owl testified that he first interviewed Shell two days after the Petitioner confessed and that Shell recalled that the Petitioner was "standing behind [Shell] about 20 or 25 feet" and "had a gun." [CR Doc. 69 at 164]. Shell also recalled that "the gun was still going off as [Shell] was running to his [car]." [Id. at 165].

On cross-examination, the Petitioner's counsel questioned Detective Owl about the adequacy of his investigation and Shell's ability to recall facts accurately, given his intoxication. [CR Doc. 69 at 172-74, 191-92]. Detective Owl acknowledged that Shell's perception might have been impaired but stated that Shell was "very adamant about who had assaulted him, and that person was John Bird." [Id. at 173]. As Owl explained: "That part he was clear about." [Id.].

SA Smith testified that when he talked with the Petitioner before interviewing him, he asked the Petitioner about his upset stomach. [CR Doc. 69 at 196]. The Petitioner responded that "he had a drinking problem" and that he believed his stomach was upset from alcohol withdrawal. [Id. at 197].

Dr. Dominique Toedt, an internal medicine physician at Cherokee Hospital, testified that there was nothing about Shell's blood clotting or injuries that would indicate how recent or how old his injuries were. [CR Doc. 70 at 214, 219-20]. Dr. Toedt testified that after several days you would see a different pattern of bruising but that blood clots fairly quickly and looks the same at one hour as it appears at 12 or 24 hours. [Id.].

The Petitioner elected not to testify at trial, but Nellie Littlejohn, his father's former girlfriend, testified about his whereabouts on Christmas Eve and Christmas Day. [CR Doc. 70 at 238-44]. She testified that they went to Dahne Driver's house for breakfast around 9:00 a.m. but that they returned home between 11:00 and 11:30 a.m., not at 12:30 like the Petitioner claimed during his first interview. [Id. at 243]. She further testified that the Petitioner was with her and John Bird, Sr., until Myrtle Bird picked him up to cut wood around 12:45 p.m. [Id. at 243-44]. Littlejohn acknowledged that she did not go with the Petitioner to Myrtle Bird's house. [Id. at 251]. Littlejohn also testified that Myrtle Bird had a small gray sport-utility vehicle "like a Bronco

or something like that." [Id.]. Littlejohn admitted during cross-examination that the Petitioner's father told her that they would have to lie for his son and say that he was with them during the shooting (although she denied lying on the stand). [Id. at 253]. Littlejohn also conceded that she suffered from medically-induced memory problems. [Id. at 255].

During closing arguments, the Petitioner's counsel challenged the adequacy of the investigation into Shell's shooting, noting that Detective Owl had not interviewed the witnesses who stated that the Petitioner was with them on Christmas Day or followed up on Shell's statement suggesting that there had been more than one person present when he was shot. [CR Doc. 70 at 280, 285-86]. Counsel also argued that Shell's memory was unreliable because he had been drinking heavily in the days preceding and on Christmas Day. [Id. at 284-85]. Further, counsel argued that the Petitioner's confession was unreliable because he was sick and likely to confess just to end the interview. [Id. at 289-91]. Notwithstanding these arguments, the jury convicted the Petitioner on all counts. [CR Doc. 43].

The Court conducted a sentencing hearing on August 25, 2009. The Court imposed a sentence of 210 months' imprisonment for each of Counts One and Two, and 120 months' imprisonment for each of Counts Three, Four, and Five. Counts One through Four were ordered to be served

concurrently, and Count Five (the § 924(c) violation) was ordered to be served consecutively, for a total punishment of 330 months' imprisonment. [CR Doc. 52].

The Petitioner appealed to the Fourth Circuit on two issues: the denial of the motion to suppress his confession, and the imposition of concurrent sentences for both attempted murder and assault with the intent to commit murder. The Fourth Circuit Court of Appeals affirmed his conviction and sentence in an unpublished opinion on January 31, 2011. <u>United States v. Bird</u>, 409 F. App'x 681 (4th Cir. 2011).

### D.    The Motion for New Trial

On May 29, 2012, the Petitioner, through counsel, filed a motion for a new trial based on newly discovered evidence. [CR Doc. 82]. In support of his motion for a new trial, the Petitioner presented to the Court the following evidence that was discovered after the trial.

### 1.    Deborah Caro

On July 11, 2011, Deborah Caro ("Caro") came to Detective Owl at the Cherokee Indian Police Department claiming that she had information concerning the shooting of Shell. During her interview with Detective Owl, Caro stated that on Christmas Eve 2008, she and her husband, Justin Denig ("Denig"), were drinking with Shell in their trailer located outside of her

mother's home. She said that she passed out at her mother's house, but that Denig retrieved her and brought her back to bed in the trailer. She said that she woke up at around 6:00 a.m. and found blood in the trailer. She walked outside and observed Shell bloody and lying on the ground. She claimed that she saw a "bullet mark" on Shell's arm. She said that Denig was crying and said, "I shot him." When she recommended that they take Shell to the hospital, Denig refused, stating "no, you need to help me put him in the car or I'm gonna kill you." Caro told Detective Owl that she helped Denig put Shell in the car and that Denig and Shell then drove away. Caro further said that when they left, she believed that Denig was taking Shell to the hospital. Caro reported that she did not see Denig again until late in the day when he called and asked to be picked up at a place near Bunches Creek. When she picked him up, Denig was muddy and wet, and he told her that he got lost in the woods and fell in a creek. She also described a .22 caliber derringer style pistol that Denig had in his possession.[4] Caro told Detective Owl that Denig was abusive to her and that she had not reported him until now because she was afraid of him. She stated that she had been married to

---

[4] This weapon was later recovered, but it is not believed to have been involved in the shooting.

Denig for approximately three years, but that at the time of the interview she had taken out a protective order against him.  [CR Doc. 82-6].

The Government produced this interview to Petitioner's counsel at the Federal Defender's Office. At that time Jim Allard ("Allard"), an investigator with the Federal Defenders, also joined the investigation.  On August 5, 2011, Allard briefly interviewed Caro while she was at work.  Caro affirmed her previous statement to Detective Owl.  [CR Doc. 85 at ¶ 3].  Three days later, on August 8, 2011, Allard attempted a more complete interview with Caro.  On that date, however, Caro recanted much of her previous statement.  She denied ever saying that Denig admitted to shooting Shell. At that time, Caro told Allard that Denig had been released from custody and was again residing with her at her home.  [CR Doc. 85 at ¶ 7, CR Doc. 84-4].

On May 30, 2012, Detective Owl interviewed Caro again.  In this fourth interview, Caro claimed that Denig told her one time while he was drunk that he had shot Shell, but that she did not believe it and she had not seen evidence of the shooting herself.  She said that she remembered a night when the three were together and were very drunk.  She recalled it was a Wednesday night because she recalled watching her favorite television

program.[5]  Caro stated that she had passed out, and when she awoke, she saw blood on the floor.  Varying significantly from her first account, Caro claimed that she saw Shell and Denig sitting together inside the trailer, drunk but apparently having a good time.  She said that each of them had evidence of a bloody nose, causing her to surmise that they had been in a scuffle, but she observed no evidence of hard feelings between them.  She claimed that Denig and she helped Shell out to his car because he was drunk but did not claim to see any bullet wound or any other injury other than the bloody nose. She said that Denig later went fishing, but that that was not unusual for him to do, and that he came back wet from falling in the creek.  [CR Doc. 84-1].

In this fourth interview, Caro claimed that she only learned about Shell having been shot many months later, and that she learned it from Shell, not Denig.  She asserted that on another occasion months later, Denig, while drunk, said that he had shot Shell, but that she did not believe him.  She said that on other occasions when she asked Denig about it when he was sober, he denied being involved.  Caro denied that Denig threatened to kill her if

---

[5] In 2008, Christmas Eve was on a Wednesday night, but Caro could not recall this occasion being near Christmas or any other holiday.  She also could not recall in what year the incident had occurred.  [Id.].

she did not help to get Shell into the car. Instead, she implied that her mother told her to say that because her mother does not like Denig. [Id.].

Caro again told the detective about the .22 derringer-style pistol that she and Denig owned for protection. Caro said that they kept the pistol under the mattress and that she doubted that Denig could have retrieved it from under her while she was sleeping without awakening her. She said that there had been a .22 rifle in the trailer at one time, but that someone named Justin Blake stole it in the fall of 2008 before she and Denig married. [Id.].

Caro told Detective Owl that she had not seen anything to indicate that a shooting had taken place, and that she could only testify about what Denig said about it. [Id.]. She wrote out a hand-written statement, which reads in totality, "I am willing to testify to Justin's words, that he said he shot Garce." [CR Doc. 84-2].

### 2.  Justin Denig

On August 20, 2011, Allard interviewed Denig while he was in state custody awaiting return to Florida for a probation violation. [See CR Doc. 85 at ¶¶ 12-16]. In that interview, Denig admitted to drinking with Shell on Christmas Eve 2008, and said that around 1:30 a.m. Christmas morning he went into the trailer where Caro was passed out and observed Shell standing over her with his hand in his pants. Denig claimed he was concerned that

Shell was going to sexually assault her. He also claimed that Shell turned around with his hands in his pockets, causing Denig to fear that Shell had a weapon. Denig said that he struck Shell on the head with a skillet. After striking Shell, he and Caro dragged Shell outside where Shell departed in his own car. Denig then claimed that he decided to go fishing at 2:00 a.m. and somehow lost his pole in the process. When Allard asked Denig if he shot Shell, perhaps in self-defense, Denig said he only "busted his head" with a skillet and then asked Allard, "If I did shoot him in self-defense, can you guarantee me that I would not go to prison one hundred percent?" [Id. at ¶ 16]. When Allard stated that he could made no such guarantee, Denig again denied shooting Shell. Denig also said, "I wouldn't shoot him because people would hear the gun go off," and added, "I was probably just running my mouth if I told anyone I shot Garce." [Id.].

On November 16, 2011, Detective Owl interviewed Denig. Denig essentially provided the same story that he gave to Allard. Denig refused to take a polygraph and denied shooting Shell. [CR Doc. 82-10].

### 3. Kelly Holder

Shortly after Allard completed the interview with Denig, he received a call from Denig's probation officer, Kelly Holder ("Holder"), who told Allard that she overheard Denig on a cell phone after the interview. Holder reported

that Denig called Caro and told her what he said about the skillet. It was Holder's opinion that Denig was trying to "make sure their stories matched." [CR Doc. 85 at ¶ 17].

### 4.   Joseph "Jo Jo" Caro, Jr.

On August 17, 2011, Allard interviewed Joseph "Jo Jo" Caro, Jr. ("Jo Jo"), the nephew of Deborah Caro. Jo Jo reported to Allard that during a visit to the reservation in March or April 2009, Denig told him a story about shooting a man who "hit on" Deborah Caro. Denig told Jo Jo that the man was drunk and that Denig had shot him with a .22 rifle, then threw the bullets into the river and broke down the rifle. Denig never identified this person to be Shell. [CR Doc. 85 at ¶ 10].

On October 27, 2011, Detective Owl interviewed Jo Jo, who repeated essentially the same story that he gave to Allard. Jo Jo added that Denig had told him that he and Deborah Caro then dumped the body in a cave at Bunches Creek. Jo Jo noted that Denig and Deborah Caro were both drunk and high on prescription pills and marijuana during the telling of this story. He also reported that he did not believe Denig and that he thought Denig was just trying to sound like a "tough guy." [CR Doc. 82-11].

### 5. Anita Sexton

On July 26, 2011, Detective Owl spoke to Anita Sexton ("Sexton"), who had purchased Caro's camper trailer at some point after December 2008 and subsequently transferred it to someone else. When asked if she had observed any blood stains in the trailer, Sexton reported that it was so dirty that she could not be sure, but that there was a spot about the size of a dinner plate on the carpet that might have been blood. Sexton also stated that there were several bullet holes in the door. The holes were of varying size and appeared to have been shot from both inside and outside of the trailer. Sexton also noted that Denig was a "violent drunk." [CR Doc. 82-9].

On October 19, 2011, Investigator Allard interviewed Sexton. Sexton stated that during the purchase of the trailer, she had asked Denig about the bullet holes in the trailer door and that he had replied, "Oh, I shot an Indian guy." Sexton had not referenced any such statement during her interview with Detective Owl. [CR Doc. 85 at ¶ 11].

### 6. Physical Evidence

When the camper trailer in question was eventually located, Investigator Allard examiner the trailer and observed that the trailer door had

bullets and bullet fragments in it that appeared to be .22 caliber. [CR Doc. 85 at ¶ 11].[6]

On October 17, 2012, this Court conducted an evidentiary hearing on the Petitioner's motion. At the hearing, the Court appointed counsel to represent Caro and Denig. [CR Doc. 98 at 6-8]. Denig testified that he and Caro were married in November 2008 and were living together as husband and wife in December 2008.[7] [Id. at 15]. When asked if Denig was living in a camper trailer on property owned by Caro's mother on Christmas Eve 2008, Denig invoked his Fifth Amendment right against self-incrimination. [Id. at 17]. Although Denig admitted knowing Shell, stating that they had "hung out" on occasion, Denig invoked his Fifth Amendment privilege when asked if he saw Shell on December 24, 2008. [Id. at 19-20]. He further invoked his privilege when asked if he and Caro were with Shell on that day. [Id. at 20]. Although defense counsel attempted to question Denig about

---

[6] While the Petitioner asserted in his motion for a new trial that Shell was shot with a .22 caliber rifle, this fact was not established conclusively at trial. Shell testified that he saw Bird holding a rifle prior to shooting him, but that he was not really familiar with guns and could not identify what caliber it was. Shell further testified that "from what I've heard and what the doctors tell me the size of the bullets that were in me, it was a .22 rifle." [CR Doc. 69 at 80].

[7] Denig and Caro were still married at the time of the evidentiary hearing.

whether he had confronted Shell at the trailer on Christmas Eve or Day in 2008, Denig invoked his privilege to each question.  [<u>Id.</u> at 20-22, 44].

When Caro was called as a witness, her court-appointed counsel advised the Court that she was asserting the marital adverse testimonial privilege.  [<u>Id.</u> at 45].  Over the Petitioner's objections, the Court sustained the assertion of the privilege, and Caro was not called to the witness stand and did not testify.  [<u>Id.</u> at 45-47].

Jo Jo Caro testified at the hearing that in January 2009, he was drinking with Denig at the camper.  [<u>Id.</u> at 55].  Jo Jo testified that Denig told him that one night there were three people in the camper and when Denig saw one of the guys "trying to get at" Caro, Denig beat the guy with the stock end of a .22 rifle and then "shot him a bunch of times."  [<u>Id.</u>].  Jo Jo could not recall the name of the person purportedly beaten.  [<u>Id.</u> at 70].  Jo Jo testified that Caro was present during this conversation and that all three were drinking.  [<u>Id.</u> at 56, 68].  Caro and Denig were also abusing prescription drugs.  [<u>Id.</u> at 69].  Jo Jo stated that his recollection was vague but that the incident described by Denig had occurred on Christmas Eve or Day.  [<u>Id.</u> at 72].  He later conceded, however, that Denig never said when the incident occurred, and that he (Jo Jo) had merely surmised the date based on what he had later heard from others.  [<u>Id.</u> at 92-93].  Jo Jo also testified that Denig

told him that he had gotten drunk one night and had "shot the whole camper up . . . with the Derringer .22 he had, or whatever." [Id. at 60]. Jo Jo related, however, that Denig did not say anything to link this "shooting up the camper" incident to his alleged shooting of a person, and Jo Jo agreed that the two incidents very well might have occurred at different times. [Id. at 84]. Jo Jo also testified that the camper trailer was never located on his grandmother's property. [Id. at 75, 76]. Rather, he testified that the trailer that was located on her property was purchased by Denig after the alleged shooting. [Id.].

Anita Sexton was also called as a witness at the evidentiary hearing. She testified that she had known Caro for about four years. [Id. at 101]. She stated that she met Denig through Caro. [Id.]. Sexton testified that at some undisclosed date, most likely in the winter of 2009, she purchased the camper trailer that had belonged to Denig and had moved it down to a campground. [Id. at 115-19, 126]. At the time of this purchase, Sexton observed dark stains on the carpet of the trailer, including one large, dinner plate-sized stain with splatter spots. She also observed bullet holes and a knife stab mark in the door. [Id. at 117]. A week or two later, Caro and Denig moved to the same campground with another camper trailer. [Id. at 118]. Denig asked Sexton if he could retrieve something from his previously owned trailer and she allowed him to do so. [Id.]. While he was there, Sexton asked

Denig how the bullet holes came to be in the trailer door. [Id.]. Sexton testified that "he said it jokingly, I thought, that he had shot someone. And I took it as a joke." [Id. at 139].

Denig's supervising probation officer, Kelly Holder, was also called as a witness during the hearing. [Id. at 142]. Holder testified that Denig had several North Carolina charges brought against him for assault on a female, charges which involved Caro and all of which were dismissed. [Id. at 145]. At the time of the hearing, Denig had pending charges for intoxication and disruption, driving while intoxicated, reckless driving, resisting a public officer, and a second intoxication and disruption charge. [Id.]. As recently as the week before the evidentiary hearing, Caro had pressed assault charges against Denig which were dismissed when Caro did not appear in court. [Id.].

Holder testified that in October 2011, she had arrested Denig for certain charges and brought him in for processing. [Id. at 150-53]. At the conclusion of processing, she transported Denig to the jail. [Id. at 153]. During that ride, she overheard Denig make a cell phone call to someone whom she believed to be Caro. [Id. at 153]. Holder testified that what she overheard during that call caused her to later telephone Allard. [Id. at 161].

Holder further testified that she was present when Denig received the subpoena for this evidentiary hearing, and that he appeared "very nervous" upon being served. She also testified that Denig said that "he had thought about absconding, just leaving, running away." [Id. at 168-69].

Detective Gene Owl also testified at the hearing. Detective Owl testified that during the course of his investigation, he was unable to confirm the location or date and time of the shooting and was unable to confirm any vehicle involved. [Id. at 174]. He further testified that the weapon used to shoot Shell had not been recovered. [Id. at 173-74]. Detective Owl testified that in July 2011, Caro just appeared at the police department asking to speak with an officer. [Id. at 176-77]. Detective Owl interviewed Caro at that time, and his notes of that interview were received in evidence as an offer of proof with no ruling as to their admissibility. [Id. at 185]. Detective Owl subsequently conducted a videotaped interview with Caro on May 30, 2012, and the transcript of that interview was received as an offer of proof as well. [Id. at 187].

Federal Defenders Investigator James Allard was the last witness called to the stand. He confirmed that his affidavit accurately reflected his interviews with Deborah Caro and Justin Denig. [Id. at 206-07]. He also

identified photographs of Bird and Denig and these photographs were submitted for the Court's consideration. [Id. at 218-20].

Following the hearing, the Court entered an Order denying the Petitioner's motion for a new trial. [CR Doc. 107]. In its Order, the Court began by rejecting the Petitioner's renewed arguments regarding the validity of his confession or Shell's identification and memory (and proposed expert testimony in support thereof), holding that these issues were thoroughly litigated at trial and therefore could not provide a basis upon which to grant a new trial. [Id. at 27-28]. The Court determined that the only new evidence to be considered consisted of Caro's and Denig's statements and evidence tending to corroborate them. [Id. at 29]. The Court then considered the admissibility of those statements and concluded that most of the statements were inadmissible and that there was no basis upon which to find that a jury would probably acquit the Petitioner after a new trial. [Id. at 29–50]. This Court also found that even if all the inadmissible evidence were nevertheless considered, it still would be insufficient to meet the required threshold. [Id. at 50]. The Court noted that the conviction was supported by a confession that contained details that the Petitioner otherwise would not have known, and that Shell repeatedly identified the Petitioner by name as the shooter. [Id.]. It further noted that Caro's statement was made in the context of

seeking a protective order against Denig and that she had since recanted it. [Id.]. This Court found the remaining proffers to be vague and lacking a sufficient connection to Shell's shooting. [Id. at 50-51]. The Court therefore found that the new evidence, "even if admitted, [fell] far short of what would be necessary to overcome the evidence of the [Petitioner's] guilt." [Id. at 51].

The Petitioner appealed, and January 15, 2016, the Fourth Circuit affirmed this Court's Order denying the motion for new trial. United States v. Bird, 638 F. App'x 207 (4th Cir. 2016). While declining to address whether the marital-testimony privilege applied to Caro or whether Denig's statements would be inadmissible during a new trial, the Fourth Circuit held that even considering the statements of Caro and Denig, "the evidence is insufficient" to warrant a new trial because it would not "'probably result in acquittal at a new trial.'" Id. at 213 (quoting United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989)). The Fourth Circuit explained that the record "fully support[ed] the district court's" credibility determination that Caro's statements were "patently unreliable." Id. The Fourth Circuit also noted that this Court also recognized "the relative weakness" of the evidence of Denig's statements to third parties, consisting only of vague statements that do not specifically identify Shell as a victim of any shooting Denig may have committed. Id. The Fourth Circuit noted that "Shell knew Bird and

immediately and consistently identified Bird as the shooter," that "Bird confessed to the crime and recounted details of the crime that he could not otherwise have known," and that "Bird fled from the police on the day of the shooting and was found hiding in a closet in his father's house when he was arrested." Id. at 213-14. The Fourth Circuit concluded that this Court did not err when it determined that the Petitioner's new evidence would not make an acquittal probable and that this Court acted within its discretion when it denied the motion for a new trial. Id. at 214.

The United States Supreme Court denied the Petitioner's petition for writ of certiorari on May 16, 2016. Bird v. United States, 136 S. Ct. 2040 (2016).

### E.    The Motion to Vacate

On February 15, 2018, the Petitioner, through counsel, filed the present motion to vacate pursuant to 28 U.S.C. § 2255. [CR Doc. 119; CV Doc. 1]. In his motion, the Petitioner asserts that there is new and "previously overlooked" evidence establishing that he is factually innocent of shooting Shell and that his trial counsel provided constitutionally deficient representation. [Id. at 1]. In so arguing, the Petitioner relies upon the evidence submitted in support of his motion for a new trial, as well as certain other new evidence that is being presented to the Court for the first time.

Along with the motion to vacate, the Petitioner moves for leave to take discovery pursuant to the Rules Governing Section 2255 Proceedings in the United States District Courts. [CV Doc. 8]. The Government moves to dismiss the Petitioner's motion to vacate and opposes the Petitioner's request for discovery. [CV Doc. 13].

## II.    STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the argument presented by the Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION

### A.    Petitioner's Motion to Vacate

Section 2255 provides for a one-year statute of limitations for the filing of initial motions to vacate. That one-year period runs from the latest of:

> (1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C.A. § 2255(f). The Petitioner's motion is untimely under any of these subsections. The Petitioner's Judgment became final on May 23, 2011, 90 days after the entry of the Fourth Circuit's mandate affirming this Court's Judgment on February 22, 2011. The Petitioner filed the present motion nearly six years later, on February 15, 2018. Accordingly, his motion is untimely under § 2255(f)(1). Further, the Petitioner has not shown that his motion was filed within one year after the removal of any impediment or the recognition of a new right by the Supreme Court such that § 2255(f)(2) or (f)(3) would be satisfied. The Petitioner further does not contend that his motion was filed within one year of the discovery of the facts supporting his claims such that § 2255(f)(4) would be satisfied.

Despite the untimeliness of his motion, the Petitioner argues that he is nevertheless entitled to judicial review of his constitutional claim of ineffective assistance of counsel due to the "actual innocence gateway" established in McQuiggin v. Perkins, 569 U.S. 383 (2013). This gateway allows review of habeas petitions filed outside of the one-year statute of limitations under 28 U.S.C. § 2255(f) for a petitioner who can demonstrate that it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327 (1995). As the Supreme Court repeatedly emphasized in McQuiggin, the so-called "Schlup standard" is a demanding one. See McQuiggin, 569 U.S. at 387 ("We caution, however, that tenable actual-innocence gateway pleas are rare…."); id. at 394-95 ("The miscarriage of justice exception, we underscore, applies to a severely confined category…."); id. at 399 ("To invoke the miscarriage of justice exception to AEDPA's statute of limitations, we repeat, a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" (quoting Schlup, 513 U.S. at 327)); id. at 401 ("We stress once again that the Schlup standard is demanding.").

To establish a claim of actual innocence, the Petitioner must support his allegations of constitutional error "with new reliable evidence that was not

proffered at trial." Finch v. McKoy, 914 F.3d 292, 298-99 (4th Cir. 2019). The Petitioner also must demonstrate that it is more likely than not that "the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt." Id. at 299 (quoting Teleguz v. Pearson, 689 F.3d 322, 329 (4th Cir. 2012)). In analyzing the Petitioner's claims, the Court must make "a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." House v. Bell, 547 U.S. 518, 539 (2006) (internal citations and quotation marks omitted). Then, based on the total evidentiary record, the Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." Finch, 914 F.3d at 299 (quoting Bell, 547 U.S. at 538). If the new evidence so requires, this determination may include consideration of the credibility of the witnesses who testified at trial. Schlup, 513 U.S. at 330 (noting that "the habeas court may have to make some credibility assessments").

In reviewing the evidentiary record, the Court must "not . . . make an independent factual determination about what likely occurred, but rather [must] assess the likely impact of the evidence on reasonable jurors." Bell, 547 U.S. at 538. As the Supreme Court has explained:

> [T]he Schlup standard does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt -- or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

Bell, 547 U.S. at 538.  Only once the Petitioner satisfies the Schlup standard may the Court proceed to review the merits of the Petitioner's otherwise procedurally defaulted claims.  See Finch, 914 F.3d at 298.

In seeking to vacate his sentence, the Petitioner first cites the evidence presented in support of his motion for a new trial, including the statements of Deborah Caro, Justin Denig, Jo Jo Caro, and Kelly Holder.  Even assuming that such evidence would be admissible at a retrial of this matter, the Court has already found such evidence to be insufficient to meet the lower "probability-of-acquittal" standard for a motion for a new trial, under which a defendant need only show that the evidence would *probably* produce an acquittal.  As the Court previously noted in denying the Petitioner's motion for a new trial [CR Doc. 107], Deborah Caro's multiple statements about the shooting are inconsistent and inherently unreliable.  Jo Jo Caro's statements are not sufficiently specific to incriminate Justin Denig in Shell's shooting.  Further, Denig himself denied shooting Shell.  When this evidence is

considered along with the following evidence from the trial, namely: (1) Shell's testimony that he knew the Petitioner and that the Petitioner was the person who shot him; (2) Detective Owl's testimony that the Petitioner admitted, consistent with Shell's recounting of the incident, that he shot Shell after Shell cursed at him and told him to go ahead; and (3) Perry Shell's and Theresa McCoy's testimony that Shell identified the Petitioner as the shooter, the Court is constrained to conclude that the Petitioner has failed to meet the more demanding standard under Schlup, namely that it is more likely than not that *no reasonable juror* would find him guilty beyond a reasonable doubt based on this evidence.

In addition to the evidence presented in support of the motion for new trial, the Petitioner relies upon the following new evidence to support his claim of actual innocence. The Court will discuss each of these items of new evidence in turn.

### 1.    Report of Dr. Thom Mayer

The Petitioner first submits the report of Dr. Thom Mayer. Dr. Mayer is an emergency-room physician who served for over 25 years as the medical director of police helicopter and EMS teams in Fairfax County, Virginia. [CV Doc. 1-3 at 1-40]. Dr. Mayer specializes in trauma and critical care services and has "participated in thousands of trauma case reviews and

forensic trauma reconstructions, including gunshot wounds (GSW) and blunt force trauma." [Id. at 1, 9-40]. Dr. Mayer reviewed Shell's medical records and other material and opines that Shell was both shot and hit with a large, flat instrument "many hours before" Christmas morning in 2008. [Id. at 5]. As a basis for his opinion, Dr. Mayer explains that "[t]rauma patients with chronic alcoholism 'ooze' from their wounds for hours after acute injury" and that the medical records indicate only the presence of dried blood around Shell's wounds. [Id. at 4-5]. Dr. Mayer therefore opines that the wounds Shell received "were sustained no less than 10-12 hours and as much as 15-18 hours prior to" him being airlifted to Mission Hospital. [Id. at 4, 5].

Dr. Mayer also opines that Shell's memory and judgment were "severely compromised due to intoxication from both drugs and alcohol, the narcotic medications administered to him, and his chronic mental impairment."[8] [Id. at 3]. In Dr. Mayer's opinion, "based upon a preponderance of the facts and with a high degree of scientific certainty, Mr.

---

[8] In finding that Shell had a "chronic mental impairment," Dr. Mayer relied upon a letter written on January 7, 2009 by a licensed psychologist who met with Shell on two occasions – once on December 22, 2008, a few days before the shooting and once on January 7, 2009, when Shell was in the hospital recovering from his gunshot wounds. Based on the December interview, the psychologist "suspected that [Shell] had problems with thinking and memory due to a car accident he had been involved in November 2007." [CV Doc. 1-4 at 31-32].

Shell was confabulating,"[9] and that "[a]ny and all statements made by him on December 25, 2008 should not have been relied upon as reliable statements of fact and cannot reasonably be considered to be accurate."  [Id. at 5].

While Dr. Mayer opines that Shell was injured well before Christmas morning and that Shell was confabulating when he identified the Petitioner as the shooter, Dr. Mayer does not provide any scientific support for those conclusions.  Dr. Mayer premises his opinion about the timing of the shooting on the existence of dried blood on the victim.  The existence of dried blood, however, does not necessarily exclude the presence of the type of "oozing" wounds Dr. Mayer opined would be found in a more recent injury.  In any event, the precise timing of the shooting was never critical to establishing the Petitioner's guilt, especially in light of the fact that Shell repeatedly identified the Petitioner as the shooter and the Petitioner confessed to shooting Shell in the woods.

As for his opinion regarding confabulation, Dr. Mayer does not cite any peer-reviewed scientific studies to corroborate his opinions, nor does his experience and education as a trauma physician or his curriculum vitae

_____

[9] According to Dr. Mayer, "confabulation" is "a psychiatric disorder in which the patient (unintentionally and without volition) fabricates sometimes clear 'memories' of events, about which they can be quite confident, despite clearly contradictory evidence.  It is very common in patients with alcoholism, drug abuse, and cognitive disorders."  [Id. at 6].

suggest that he has any education or expertise in forensic science or cognitive disorders. Dr. Mayer did not personally examine Shell, and he based his opinion that Shell had an underlying cognitive disorder upon a letter of a psychologist, not upon the review of any of Shell's medical records. For these reasons, the Court concludes that Dr. Mayer's opinions (even if admissible) would not make it more likely than not that no reasonable juror would find the Petitioner guilty beyond a reasonable doubt.

### 2. Barry D. Colvert

Next, the Petitioner submits the Declaration of Barry D. Colvert, a forensic polygrapher from Virginia. [CV Doc. 1-4 at 60-63]. Colvert states that he has reviewed the charts and report related to the Petitioner's 2009 polygraph examination and that, in his opinion, the examination charts "were very poor-quality tracings that were not acceptable for a true quality review." [Id. at 60]. Colvert concludes that the charts would not support a finding that the Petitioner had lied. [Id. at 60]. Colvert further reports that he conducted a second polygraph examination of the Petitioner in 2012, and that, in his opinion, the results of that examination indicate that "it is extremely unlikely that [the Petitioner] was responsible for [Shell's] shooting." [Id.].

As for the first polygraph addressed by Colvert, the results of this test were not admitted into evidence at trial, and thus any evidence attempting to

undermine the validity of that test does not demonstrate that it is more likely than not that no reasonable juror would find the Petitioner guilty beyond a reasonable doubt at a retrial of this matter.

As for the results of the second polygraph, which Colvert conducted, such evidence does not support the Petitioner's claim of actual innocence. Polygraph results are not considered admissible, reliable evidence of innocence. See Bolton v. Berghuis, 164 F. App'x 543, 549-50 (6th Cir. 2006); Shorb v. Nooth, 727 F. App'x 442, 443 (9th Cir. 2018) (unpublished).

Regardless of the results of any polygraphs, however, the fact remains that the Petitioner confessed to Detective Owl that he shot Shell. [See CV Doc. 1-5 at 2].  In so doing, the Petitioner conveyed details which were similar to Shell's account of the shooting and would not otherwise generally be known, such as the fact that shortly before the Petitioner shot Shell, Shell cursed at him and told him to go ahead and shoot him.  [See CV Doc. 1-4 at 30; CV Doc. 1-5 at 2].

For these reasons, the Court concludes that Colvert's report fails to satisfy the Schlup standard.

### 3.    Beth E. Stang

The Petitioner also relies upon the Declaration of Beth E. Stang ("Stang") in support of his claim of actual innocence.  Stang is an attorney

who represented a defendant in another criminal matter who had confessed to SA Smith. [CV Doc. 1-4 at 64-65]. Stang states in her Declaration that, as part of her representation of this defendant, she investigated Smith's personnel file in 2012 and learned that SA Smith had been charged with assault in 2009 after he allegedly slammed or pushed a suspect into a wall because the suspect refused to confess. [Id. at 64]. Stang also states that a defendant in Macon County, North Carolina had been found not guilty of criminal charges after Smith's tactics were used to raise doubt about the reliability of the defendant's confession and that an investigation in June or July of 2009 likely would have revealed this acquittal. [Id.].

While Stang's Declaration may raise questions regarding SA Smith's conduct in other cases, the Petitioner has presented no evidence that SA Smith's interview of the Petitioner or his administration of the polygraph in this case was in any way improper. Moreover, Stang's Declaration fails to mention that the assault charge against SA Smith was later dismissed because the prosecutor "found no evidence" that Smith had assaulted the suspect. [See CV Doc. 1-7 at 22]. For these reasons, the Court concludes that Stang's Declaration does not make it more likely than not that no

reasonable juror would find the Petitioner guilty beyond a reasonable doubt in this case.[10]

### 4. Petitioner's Declaration

In a Declaration submitted in support of his motion to vacate, the Petitioner states that he had "never confessed to the attempted murder of Garce [Shell]." [CV Doc. 1-5 at 1]. In so arguing, the Petitioner implies that SA Smith and Detective Owl lied when they stated that the Petitioner confessed to them about the shooting. The Petitioner presents no evidence, however, that Smith or Owl fabricated the confession.

The Petitioner further asserts in his Declaration that he identified numerous alibi witnesses immediately after he was charged -- including Mystical Parker, Cindy Taylor, Jackie Raby Bradley, Jim Driver, Dahne Driver, Johnna Bird, Jimiqua Bird, Ray Santiago, and Mary "Penny" Bird -- but that his trial counsel never spoke with any of them. The Petitioner, however, has not presented any affidavits or declarations from these

_____

[10] It is noted that much of the evidence Petitioner cites would be of questionable admissibility if a new trial were allowed. Dr. Mayer's "confabulation" opinion would appear to be outside of his area of expertise. Colvert's opinions regarding the inadmissible polygraph examinations would appear to be likewise inadmissible. Stang's evidence of mere allegations made against a witness in other, unrelated, cases is no more problematic. These evidentiary hurdles, along with those addressed at the motion for new trial, only serve to underscore the weakness of Petitioner's evidence and the commensurate weakness of his motion.

witnesses, and thus there is nothing in the record to demonstrate that any of these witnesses could have provided a better alibi for the Petitioner than the one offered by Nellie Littlejohn at trial. The Petitioner's Declaration, therefore, does not support the Petitioner's claim of actual innocence.

### 5.    Interviews of Agnes and Brittany Welch

Finally, the Petitioner submits transcripts of interviews of Agnes and Brittany Welch, two of the neighbors who first discovered Shell after his car accident. These interviews were conducted by telephone by a member of the Petitioner's legal team in preparation for filing the motion to vacate with [CV Doc. 1-4 at 11-20]. In these interviews, Agnes states that she did not recall that Shell said anything to her at the scene and that he did not tell her who had "beat him up." [Id. at 11]. Agnes states further that she did not think he could have told her anything because he "was already going in shock from the cold." [Id.]. Brittany, on the other hand, states that Shell stated repeatedly that someone had beaten him up. [Id. at 15-16, 18].

The Petitioner argues that these interviews demonstrate that neither Agnes nor Britney heard Shell identify the Petitioner as the shooter at the scene of the car accident, and that Shell could not have in fact identified anyone at that time because he was barely conscious. This characterization of Shell's condition, however, is not consistent with Britney's statement that

Shell repeatedly stated that someone had beaten him up. Nor is it consistent with the statement Agnes gave to the Cherokee Police Department in 2009, in which she stated that Shell was able to state at the scene that he had been beaten up. [CV Doc. 1-4 at 43]. Moreover, while Agnes and Britney may not have heard Shell identify his assailant, the Petitioner cannot show that no reasonable juror would find him guilty beyond a reasonable doubt based on this evidence in light of: (1) Theresa McCoy's sworn testimony at trial that Shell spoke to her on the scene and identified the Petitioner as the one who shot him; (2) SA Sidwell's report that while in the hospital Shell identified Bird as his assailant and described the shooting consistently with the Petitioner's own statement about the shooting; and (3) Perry Shell's trial testimony that he was present at the hospital and heard his brother tell SA Sidwell that the Petitioner was the shooter.

Having reviewed the new evidence presented by the Petitioner, and considering such evidence holistically along with the evidence that was produced at trial, the Court concludes that the Petitioner has not met the demanding standard set forth in Schlup. Most of the evidence he claims on which he relies has already been determined to be insufficient to provide a probable basis for acquittal, such as to warrant the granting of a new trial. Even considering the additional new evidence discussed above, the

Petitioner has failed to show that it is more likely than not than no reasonable juror would have found him guilty.

As the Petitioner has failed to establish sufficient evidence to trigger the actual innocence gateway, the Court concludes that his motion to vacate must be dismissed as untimely. Therefore, the Court need not reach the merits of his procedurally barred claims based on the ineffective assistance of counsel. Even if such claims had been timely presented, however, the Court finds that they are without merit.

To establish a claim of ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d

112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

The Petitioner first argues that his counsel did not adequately investigate the case or prepare for trial.  Contrary to the Petitioner's argument, however, a fair reading of the trial transcript makes clear that trial counsel was well-prepared for trial and was well-versed in both the facts and applicable law.  Counsel effectively and extensively cross-examined each of the Government's witnesses and presented an alibi defense. Through their arguments and examination of the witnesses, counsel called into question the reliability of both Shell's identification of the Petitioner as his assailant and the Petitioner's confession.  The Petitioner has not identified any admissible evidence that his attorneys should have uncovered that likely would have yielded a different result.  While the Petitioner argues that his attorneys should have interviewed additional alibi witnesses, many of those witnesses had provided statements to the police, and none of them could verify the Petitioner's whereabouts on Christmas Day better than Littlejohn.

The Petitioner also argues that his attorneys should have uncovered evidence that SA Smith had been accused of misconduct in other cases.

The Petitioner, however, has not produced any evidence that SA Smith *actually engaged* in such misconduct, either in those cases or in the case at hand. Even if such evidence were available and admissible to impeach SA Smith as a witness, however, the Petitioner has not shown a reasonable likelihood of a different result, especially in light of: Detective Owl's testimony that the Petitioner also confessed to him when SA Smith was not present; Shell's identification of the Petitioner as his assailant; and the evidence that the Petitioner fled from police on the night after the shooting, which evidences a consciousness of guilt.

In short, the Petitioner has not established that his counsel's performance at trial was deficient, nor has he shown a substantial likelihood of a different result if his attorneys had tried his case differently. Therefore, even if the Court reached the merits of the Petitioner's procedurally defaulted claims, the motion to vacate would still be denied and dismissed.

## B. Petitioner's Motion for Leave to Take Discovery

The Petitioner also moves the Court for discovery in this § 2255 proceeding. [CV Doc. 8]. To obtain leave to serve discovery requests, the Petitioner has the burden to show "good cause" under Rule 6(a) of the Rules Governing Section 2255 Proceedings. See Bracy v. Gramley, 520 U.S. 899, 908 (1997). "Good cause" does not exist where a petitioner requests

discovery on a claim that fails as a matter of law. <u>See</u> <u>Thomas v. Taylor</u>, 170 F.3d 466, 474 (4th Cir. 1999). Because the Court has concluded that the Petitioner's claims all fail as a matter of law, his request for discovery must be denied.

## V.    CONCLUSION

For all these reasons, the Court concludes that the Petitioner's motion to vacate must be denied and dismissed.  The Petitioner's motion for leave to conduct discovery is also denied.

The Court further finds that Petitioner has not made a substantial showing of a denial of a constitutional right.   <u>See generally</u> 28 U.S.C. § 2253(c)(2); <u>see also</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong") (<u>citing</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484-85 (2000)).  Petitioner has failed to demonstrate both that this Court's dispositive procedural rulings are debatable, and that the Motion to Vacate states a debatable claim of the denial of a constitutional right.  <u>Slack v. McDaniel</u>, 529 U.S. at 484-85.   As a result, the Court declines to issue a certificate of appealability.  <u>See</u> Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Government's Motion to Dismiss [CV Doc. 13] is **GRANTED**; the Petitioner's Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 [CV Doc. 1] is **DENIED AND DISMISSED**; and the Petitioner's Motion for Leave to Conduct Discovery [CV Doc. 8] is **DENIED**.

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: August 13, 2019

Martin Reidinger
United States District Judge